**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

CHARLENE A. RAMER,

        Plaintiff,

vs.                                             CASE NO. 3:08-cv-484-J-TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

**ORDER AND OPINION**

This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income payments ("SSI"). Plaintiff filed a legal brief in opposition to the Commissioner's decision (Doc. #17). Defendant filed a brief in support of the decision to deny disability benefits (Doc. #18). The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number).

The undersigned has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings. Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the undersigned in making his determinations.

Accordingly, the instant matter has been decided on the written record. For the reasons set out herein, **the Commissioner's decision is REVERSED and REMANDED**.

## I. Procedural History

On April 22, 2003, Plaintiff filed an application for SSI and DIB (Tr. 61-63). Plaintiff's claims were denied at the initial and reconsideration levels. Administrative Law Judge ("ALJ") John D. Thompson, Jr., conducted a hearing on July 26, 2005 (Tr. 497-563). The ALJ found Plaintiff not disabled by opinion dated April 14, 2006 (Tr. 18-31). The Appeals Council denied Plaintiff's request for review on March 8, 2008 (Tr. 6-8), making the ALJ's decision the final decision of the Commissioner. Plaintiff now seeks the Court's review of the ALJ's unfavorable decision pursuant to 42 U.S.C. §§ 405(g); 1383(c)(3) (Doc. #1).

## II. Standard of Review

A plaintiff is entitled to disability benefits under the Social Security Act when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A).

For purposes of determining whether a claimant is disabled, the law and regulations governing a claim for disability benefits are identical to those governing a claim for supplemental security income benefits. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986). The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(i-v), 416.920(a)(4)(i-v);[1] *Crayton v. Callahan*, 120 F. 3d 1217,

---

[1]Unless otherwise specified, all references to 20 C.F.R. will be to the 2009 edition.

1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of HHS*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir.

1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations. 20 C.F.R. §§ 404.704, 416.912(c).

### III. Background Facts

Plaintiff was born on January 17, 1964, and was forty-two years old when the ALJ issued his April 2006 decision (Tr. 61). Plaintiff has a twelfth grade education (Tr. 73). In her disability application, Plaintiff stated that she became disabled on April 11, 2003 due to multiple impairments, including anxiety, nervousness, bone spurs in her feet, neck pain, muscle spasms, carpal tunnel syndrome, migraines, blurred vision, digestive problems, rheumatoid arthritis, and fibromyalgia (Tr. 67). Plaintiff further stated that she stopped working as a waitress at Pizza Hut because she experience pain and stiffness in her foot due to bursitis and a knot of scar tissue (Tr. 67, 87, 507).

4

## A.     Plaintiff's Mental Impairments

In April 1999, Plaintiff was seen at the Clay County Behavioral Health Center ("CCBHC") by registered nurse practitioner, Daphne Hayes, ARNP ("Ms. Hayes") (Tr. 237). Ms. Hayes diagnosed Plaintiff with bipolar affective disorder and panic disorder, and assigned Plaintiff a current global assessment of functioning ("GAF") score of 45 with a highest GAF score of 70 within the past year (Tr. 237).[2] On May 5, 1999, Plaintiff was enroled in six months of psychiatric and lifestyle counseling through CCBHC (*see* Tr. 227, 233-34). Approximately eights months later, on January 24, 2000, Plaintiff received an Agency Discharge from CCBHC due to her completion of the aforementioned counseling program (Tr. 227).

The CCBHC Agency Discharge report states Plaintiff "had symptoms of bi-polar disorder and wanted to learn coping skills," and that her desired outcomes and expectations from the counseling program were "achieved" (Tr. 227). The Closing Narrative Summary of the report states that Plaintiff graduated from the program, did not believe she would need future services, and that she would "call" if she had future problems (Tr. 227). In addition, the discharge report provides that Plaintiff entered the counseling program with a GAF score of 48 and that she exited the program with a current GAF score

---

[2]The Global Assessment of Functioning Scale ("GAF") was designed by mental health clinicians to rate the psychological, social and occupational functioning of an individual on a mental health scale of 0-100. A GAF score of 41-50 describes "serious symptoms" and includes "serious impairment in the social, occupational or school functioning." A GAF score of 51-60 describes "moderate symptoms" and includes only moderate difficulty in functioning. A GAF score of 61-70 indicates "some mild symptoms," but generally functioning "pretty well, has some meaningful interpersonal relationships." A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors with no more than slight impairment in social, occupational or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, DSM-IV, 32-34 (4th ed., American Psychiatric Assoc. 2000).

of 65 (Tr. 227).[3]

In June 2003, after an absence of approximately three years, Plaintiff returned to CCBHC for mental health treatment (Tr. 219). On August 4, 2003, Plaintiff again presented to Ms. Hayes and was diagnosed with bipolar affective disorder and post-traumatic stress disorder (Tr. 225). Ms. Hayes assigned Plaintiff a current GAF score of 50 (Tr. 225). Thereafter, Plaintiff returned to CCBHC for treatment every couple of months (Tr. 212-25). Ms. Hayes attended to Plaintiff during her treatment at CCBHC and managed her medications (Tr. 522).

Between August 4, 2003 and May 7, 2004, Ms. Hayes consistently assigned Plaintiff current GAF scores of 50 (Tr. 212-25, 453-58). During this time period, the progress notes from the mental status examinations conducted by Ms. Hayes indicate Plaintiff's primary stressors were the result of the illness and death of her father, relationship issues with her boyfriend, and back pain stemming from a motor vehicle accident that occurred in September 2003 (Tr. 212-25, 453-58, 514-15).[4]

On February 4, 2004, CCBHC psychiatrist, James Larson, M.D. ("Dr. Larson"), completed a mental health report regarding Plaintiff (Tr. 238). Dr. Larson noted in the report that Plaintiff exhibited mixed, labile, flat to euphoric mood and affect, concrete to grandiose thought processes, and a strong suicide potential of a chronic nature (Tr. 238). Moreover, the mental health report stated that Plaintiff displayed poor concentration and

---

[3] A GAF score of 61-70 indicates "some mild symptoms," but generally functioning "pretty well [and] has some meaningful interpersonal relationships." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, *supra*.

[4] On September 30, 2003, Plaintiff was involved in a automobile accident (Tr. 514-15). Plaintiff's vehicle was apparently "rear-ended and slammed into a head on car" (Tr. 514).

memory (Tr. 238). Plaintiff's diagnosis was bipolar affective disorder (Tr. 239). Dr. Larson reported that Plaintiff could not sustain work activity for eight hours a day, five days a week, because she is "unable to concentrate or maintain focus enough to handle employment" and "suffers chronic low back pain" (Tr. 239).

From June 2004 through June 2005, Ms. Hayes assigned Plaintiff GAF scores of 55, and on one occasion, assigned Plaintiff a GAF score of 60 (Tr. 445-52). The progress notes from the mental status examination conducted by Ms. Hayes on June 7, 2005 indicate Plaintiff reported being "more organized" and was "getting things done" with "less confusion" (Tr. 445).

On July 29, 2005, Dr. Larson completed a mental residual functional capacity questionnaire wherein he assigned Plaintiff a current GAF score of 55 and a highest GAF score for the past year of 70 (Tr. 476). Dr. Larson further reported that Plaintiff lacked the mental abilities and aptitudes needed to perform unskilled, semiskilled, or skilled work because Plaintiff had "no useful ability to function" and was "unable to meet competitive standards" (Tr. 478-80). Moreover, Dr. Larson noted that Plaintiff demonstrates "poor concentration, judgment, insight and organization skills," and that Plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described within the evaluation (Tr. 478-80). Finally, Dr. Larson stated that Plaintiff would have difficulty working at a regular job on a sustained basis because Plaintiff "can hardly leave her home" (Tr. 480).

7

**B.     Plaintiff's Physical Impairments**

From May 2003 through June 2003, Plaintiff sought treatment from Archana Goel, M.D. ("Dr. Goel"), for multiple joint and muscle pains that she described as having gradually worsened over the past ten years (Tr. 125-27). On May 20, 2003, a physical examination of Plaintiff performed by Dr. Goel revealed the presence of multiple soft tissue tender points and crepitus of the knee (Tr. 126). Dr. Goel reported that Plaintiff most likely suffered from fibromyalgia (Tr. 126). Laboratory results from May 20, 2003 demonstrated a positive rheumatoid factor (Tr. 127). On June 11, 2003, Dr. Goel diagnosed Plaintiff with fibromyalgia and prescribed her Lortab[5] for pain (Tr. 125).

On October 9, 2003, at the request of the Commissioner, Plaintiff underwent a consultative examination by R.D. House, M.D. ("Dr. House") (Tr. 142-45). Physical examination of Plaintiff performed by Dr. House revealed a tender neck with decreased range of motion, crepitation of the left knee, and tenderness in all large muscle masses (Tr. 143). Plaintiff exhibited weakness in the grip of her right hand and she had difficulty writing and buttoning her clothing (Tr. 143). Dr. House provided diagnoses of fibromyalgia with muscle pain to large muscles, moderate right carpal tunnel syndrome, mild left carpal tunnel syndrome, left knee arthritis, plantar fascitis to both feet, and history of rheumatoid arthritis (Tr. 143-45).

A cervical spine x-ray performed at the Orange Park Medical Center soon after Plaintiff's motor vehicle accident of September 30, 2003 revealed normal vertebral

---

[5] The generic name for Lortab is acetaminophen and hydrocodone. "Hydrocodone is in a group of drugs called narcotic pain relievers. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone. The combination of acetaminophen and hydrocodone (Lortab) is used to relieve moderate to severe pain." http://www.drugs.com/lortab.html (last visited August 31, 2009).

alignment as well as normal height and appearance of the intervertebral disc spaces (Tr. 161). M.W. Kilgore, M.D. ("Dr. Kilgore"), treated Plaintiff after the 2003 motor vehicle accident with respect to Plaintiff's complaints of neck and back pain (Tr. 321-33). On November 24, 2003, Dr. Kilgore diagnosed Plaintiff with right carpal tunnel syndrome, right lower radiculopathy, multiple cervical herniated disks, and history of rheumatoid arthritis and fibromyalgia (Tr. 324). At that time, Dr. Kilgore stated that Plaintiff was unable to work (Tr. 324). On March 16, 2004, however, Dr. Kilgore reported that Plaintiff could perform "light duty" work including lifting up to twenty pounds intermittently as of that date (Tr. 332).

From May 2004 through May 2005, Plaintiff sought monthly pain management services from William Jacobs, M.D. ("Dr. Jacobs"), at the Magnolia Urgent Care Center (Tr. 422-44). On May 25, 2005, physical examination of Plaintiff conducted by Dr. Jacobs displayed chronic tenderness over the lower lumbar and diffuse arthritic changes in joints with mild tenderness and swelling (Tr. 422). Plaintiff was diagnosed with gastroesophageal reflux disease, hyperlipidemia, depression, back pain, weakness, and menopausal symptoms (Tr. 422).

At the July 26, 2005 hearing, Plaintiff testified that she quit her job as a waitress on April 11, 2003 because she had painful bone spurs in her feet (Tr. 507). Plaintiff stated that she requires treatment for fibromyalgia and rheumatoid arthritis (Tr. 511), and that she experiences "trigger points" in her back and arms (Tr. 513). Plaintiff stated that she also suffers from panic attacks that occur daily and last for up to twenty minutes (Tr. 528-29).

Plaintiff further testified that she cannot be on her feet for more than fifteen minutes at one time due to lower back and foot pain (Tr. 530-31). She testified she is able to sit for about ten minutes before she needs to change positions in order to relieve pain (Tr. 531).

9

Plaintiff believes she can walk approximately 100 feet, lift up to 20 pounds, and bend on her knees to pick up an item from the floor (Tr. 531-32, 536).

As to her household activities, Plaintiff stated that she tries to clean her apartment but claims she needs help with the dishes and laundry because she cannot stand on her feet for long periods of time (Tr. 537). Plaintiff further testified that she can cook meals for her family (Tr. 537). In addition, Plaintiff testified that she drives her car to the park, to doctor appointments, and to complete errands, such as grocery shopping (Tr. 539).

Upon questioning by her attorney, Plaintiff claimed her neck pain was between a 7 and 8 on a scale of 1-10 every day (Tr. 540). Plaintiff said her pain travels down her right arm to her hand (Tr. 541). In addition, Plaintiff testified that she also has a constant nagging and aching pain in her lower back and that the pain "shoots down her left leg," causing her left leg to "go out" (Tr. 541). Plaintiff further stated that the daily pain level in her back is approximately a 6 on a scale of 1-10 and that her neck and back pain has worsened since she stopped working (Tr. 542-44). Finally, Plaintiff asserted that she has problems lifting and carrying items with her hands and that she lays on her back for twenty minutes, at least three times a day, to relieve her back pain (Tr. 542-43).

## IV. Analysis

Plaintiff raises two issues on appeal. First, Plaintiff contends the ALJ failed to give the proper weight to the opinion of her treating physician, Dr. Larson (Doc. #17 at 13). Secondly, Plaintiff contends the ALJ failed to properly assess her credibility with respect to her subjective complaints of pain (Doc. #17 at 15).

Plaintiff claims the ALJ erred in rejecting Dr. Larson's opinion that Plaintiff was unable to work due to her mental impairments. The undersigned is not persuaded by this

10

argument for the reasons set forth below.

The Eleventh Circuit and the Regulations require the ALJ to give substantial weight to the opinion, diagnosis, and medical evidence of a treating physician, unless there is good cause to do otherwise. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 416.927(d). The Eleventh Circuit has concluded "good cause" exists to discount a treating physician's opinion when: (1) the opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

Here, the ALJ stated in his decision that "little or no weight" was given to the opinions expressed in the July 29, 2005 residual functional capacity questionnaire submitted by Dr. Larson (Tr. 476-81) because the residual functional capacity was "obviously substantially overstated" (Tr. 27-28). Specifically, the ALJ noted that Dr. Larson's opinions were overstated because they were inconsistent with CCBHC's medical records and other record evidence (Tr. 28).

For the reasons stated herein, the undersigned finds the ALJ's decision to afford little or no weight to the opinions expressed in the residual functional capacity questionnaire submitted by Dr. Larson is supported by substantial evidence.

First, the ALJ noted that the mental residual functional capacity questionnaire indicates Plaintiff was assigned a highest GAF score of 70 for the past year and a current GAF score of 55 (Tr. 476). A GAF score of 51-60 describes "moderate symptoms" and includes only moderate difficulty in functioning. A GAF score of 61-70 indicates "some mild symptoms," but generally functioning "pretty well [and] has some meaningful interpersonal

relationships." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, DSM-IV, *supra*. Notwithstanding Dr. Larson's assessed GAF scores, he stated Plaintiff was "unable to meet competitive standards" and had "no useful ability to function" in any of the work related activities that are necessary to perform unskilled, semiskilled or skilled work (Tr. 478-80). As defined by the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Dr. Larson's assessed GAF scores, *supra*, belie his representation that Plaintiff has "no useful ability to function" (*see* Tr. 476, 478-80).

Secondly, the progress notes from the mental status examination conducted by Ms. Hayes on June 7, 2005 do not lend support to Dr. Larson's opinion that Plaintiff lacked the mental abilities and aptitudes needed to perform any level work activity. Specifically, the progress notes indicate that Plaintiff reported being "more organized" and was "getting things done" with "less confusion" (Tr. 445). In addition, the more recent GAF scores assessed by Ms. Hayes, which range from 55 to 60 (Tr. 445-52), indicate only a moderate level of impairment and do not support Dr. Larson's assessment of complete incapacity.

As additional support for giving Dr. Larson's opinion little to no weight, the ALJ pointed out that Dr. Larson had apparently personally seen Plaintiff on only one occasion, which the ALJ found, "undermines his [Dr. Larson's] ability to offer any kind of meaningful assessment of [Plaintiff's] ability to work or do anything else" (Tr. 28). *See Crawford v. Comm'r of Soc. Security*, 363 F.3d 1155, 1160 (11th Cir. 2004) (*citing McSwain v. Bowen*, 814 F.2d at 619) (holding that opinions of one time examiners were not entitled to deference because they were not treating physicians).

The ALJ emphasized:

> The hallmark of a treating physician is someone who has seen the claimant on a fairly frequent basis so that they might have a better insight into their overall medical condition. As Dr. Larson apparently saw this claimant [Plaintiff] only once (though the claimant said she could not ever remember seeing him), he is hardly in any position to offer any opinion on this claimant's mental functioning. His assertion that he saw the claimant monthly is patently incorrect and is certainly not supported by the claimant's own hearing testimony nor the progress notes from the mental health facility [CCBHC] which demonstrate that the claimant was seen by a psychiatric nurse [Ms. Hayes].

(Tr. 28). The undersigned notes the ALJ's aforementioned assertions with respect to Dr. Larson's limited contact with Plaintiff are confirmed by the record (*see* Tr. 212-39, 445-59, 521).

Based on the foregoing, the undersigned finds the record evidence supports the ALJ's determination that Dr. Larson's opinions regarding Plaintiff's limitations were inconsistent with Ms. Hayes' treatment notes and the other evidence of record. Accordingly, the undersigned finds the ALJ's decision to give little to no weight to Dr. Larson's opinion that Plaintiff lacked the mental abilities and aptitudes needed to perform any level of work activity is based on substantial evidence.[6]

Plaintiff next argues the ALJ failed to "properly evaluate" Plaintiff's credibility regarding her symptoms of pain and did not evaluate Plaintiff's subjective complaints of pain in accordance with the Eleventh Circuit pain standard (Doc. #17 at 15). The undersigned is persuaded by this argument.

---

[6]Plaintiff additionally argues in a perfunctory manner that the ALJ should have considered side effects from Plaintiff's medications (Doc. #17 at 15). The undersigned finds this argument immaterial because Plaintiff has neither alleged, nor established that side effects of her medications, if any, are disabling. At the hearing, Plaintiff did not testify with respect to experiencing any side effects from her medications (*see* Tr. 497-563) and Dr. Hayes, who managed Plaintiff's medications, consistently reported that Plaintiff experienced no side effects from her medications (*see* Tr. 212-17, 445-54).

13

Where the ALJ decides not to credit a plaintiff's testimony about an asserted condition, the ALJ must articulate specific and adequate reasons based on substantial evidence for so doing, or the decision must be obvious as to the credibility finding. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Moreover, if proof of disability is based upon subjective evidence of pain and a credibility determination is critical to the decision, the ALJ must articulate adequate reasons for rejecting the claimant's allegations of pain. *Foote v. Chater*, 67 F.3d at 1561. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *Id.* at 1562 (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)).

In evaluating the credibility of Plaintiff's testimony, the ALJ stated, "[a]fter considering the evidence of record, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms [were] not entirely credible" (Tr. 26). The undersigned, however, finds the reasons the ALJ articulated for discounting Plaintiff's subjective complaints of pain are not supported by substantial evidence of record because it appears the ALJ did not consider Plaintiff's fibromyalgia when making said credibility determination (*see* Tr. 26-29).

To illustrate, although in his findings of fact and conclusions of law section the ALJ recognized Plaintiff had been diagnosed with fibromyalgia, the ALJ, in discrediting Plaintiff's testimony as to the limiting effects of her medical conditions, stated: "There is *nothing* in the evidence to support a diagnosis of fibromyalgia." (Tr. 23, 29) (*emphasis added*). As such, it appears the ALJ both failed to consider Plaintiff's fibromyalgia when assessing her credibility and also made an impermissible medical finding.

14

An ALJ may not substitute his "medical opinion" for the medical opinion of the treating physician. *Jones v. Barnhart*, 318 F.Supp.2d 1102, 1106 n.7 (N.D. Ala. 2004); *see also Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., *concurring*) ("as a hearing officer [an ALJ] may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional"). Furthermore, absent a showing of good cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).

The undersigned is unable to determine how the ALJ concluded Plaintiff did not have an adequate diagnosis of fibromyalgia other than by incorporating his own medical opinion(s) instead of deferring to Plaintiff's treating physician(s). The diagnosis of fibromyalgia is based largely on a patient's subjective complaints, and positive laboratory findings are simply unavailable. *Brown v. Astrue*, No. 3:07cv231/LAC/MD, 2008 WL 4056160, at *5 (N.D. Fla. Aug. 25, 2008).[7] The Eleventh Circuit has noted that the hallmark of fibromyalgia is a lack of objective evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

The American College of Rheumatology has developed diagnostic criteria for fibromyalgia. Specifically, a person can be affirmatively diagnosed with the condition if he or she has widespread pain in combination with tenderness in at least 11 of 18 specific tender point sites. *See* NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES, Questions and Answers About Fibromyalgia (2009), available at http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm (last visited Sep. 3, 2009). The

---

[7]Unpublished opinions are not considered binding authority; however, they may be cited as persuasive authority pursuant to the Eleventh Circuit Rules. 11th Cir. R. 36-2.

Seventh Circuit has held that requiring positive laboratory findings for fibromyalgia is error. *Sarchet v. Chater*, 78 F.3d 305 (7th Cir.1996). "[Fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." *Id.* at 306.

Here, the medical evidence indicates that Dr. Goel found multiple soft tissue tender points when he conducted a physical examination of Plaintiff (Tr. 125-26). Dr. Goel thereafter diagnosed Plaintiff with fibromyalgia (Tr. 125-26). In addition, Plaintiff underwent a consultative examination by Dr. House, at the request of the Commissioner, whereby Dr. House diagnosed Plaintiff with fibromyalgia with "muscle pain to large muscles" (Tr. 143-45). Moreover, Dr. Kilgore diagnosed Plaintiff with fibromyalgia (Tr. 324), and Plaintiff testified that she suffered from fibromyalgia and took Lortab to alleviate the pain she experienced from that condition (Tr. 511-12).

As evidenced by the hearing transcript, the ALJ appears to not have a clear understanding of the nature of fibromyalgia. For instance, the ALJ's comments regarding fibromyalgia were, in pertinent part:

> Q. Fibromyalgia is a diagnosis of exclusion.
> A. Um-hum.
> Q. Do you know what that is?
> A. No, sir.
> Q. That's when they can't find anything else wrong with you, they hang that label on you.

(Tr. 512).

Another portion of the hearing transpired as follows:

> Q. So what symptoms of fibromyalgia do you *think* you're having?
> A. Just the trigger points on my back, and my arms and—
> Q. Trigger points, where did you learn about those trigger points?

16

      A.     Dr. Gowell [sic].

(Tr. 513) (emphasis added).

Fibromyalgia "has been recognized by The American College of Rheumatology ("ACR") as both real and difficult to confirm" *Brown*, 2008 WL 4056160, at *5. The American College of Rheumatology has described fibromyalgia as:

> A syndrome [that] is a common form of generalized muscular pain and fatigue. The name 'fibromyalgia' means pain in the muscles and the fibrous connective tissues (the ligaments and tendons). . . . Fibromyalgia is especially confusing and often misunderstood because almost all its symptoms are also common in other conditions. In addition, it does not have a known cause. . . . Unfortunately, because certain syndromes lack physical and laboratory findings (signs), but depend mostly on a person's report of complaints and feelings (symptoms), these syndromes are often viewed as not being real or important.

ARTHRITIS FOUNDATION & AMERICAN COLLEGE OF RHEUMATOLOGY, Arthritis Information: Fibromyalgia (1992).

In *Stewart v. Apfel*, the Eleventh Circuit reversed an ALJ's determination that a fibromyalgia claimant's testimony was incredible based, in part, on the lack of objective evidence documenting the impairment. 245 F.3d 793, 2000 U.S. App. LEXIS 33214, at *9 (11th Cir. 2000). The court stated:

> The ALJ discredited Stewart's [the plaintiff] testimony as to the severity of her joint pains and fatigue based in part on the lack of objective evidence in the record. In view of the fact that fibromyalgia by its very nature lacks objective evidence, the ALJ did not give sufficient reasons for finding that Stewart lacked credibility.

*Id.* at n.4.

Based on the ALJ's comments regarding Plaintiff's diagnosis of fibromyalgia, both at the hearing and within his opinion, *supra*, the undersigned is unable to determine

whether the ALJ considered Plaintiff's fibromyalgia when he found Plaintiff's statements concerning the limiting effects of her pain were not entirely credible. In addition, the undersigned finds the ALJ made an impermissible medical finding when he stated that, in his opinion, there "is *nothing* in the evidence to support a diagnosis of fibromyalgia" (Tr. 29) (*emphasis added*). When an ALJ fails to consider a claimant's condition despite evidence in the record of the diagnosis, remand is required. *Vega v. Comm'r of Soc. Security*, 265 F.3d 1214, 1220 (11th Cir. 2001). Accordingly, the undersigned finds the ALJ did not apply the proper legal standards in denying Plaintiff's disability claim. Therefore, the decision of the Commissioner shall be reversed and remanded for additional proceedings consistent with this Order and Opinion.

## V. Conclusion

For the foregoing reasons, the undersigned finds the decision of the Commissioner is neither supported by substantial evidence, nor decided according to proper legal standards. The Commissioner's decision is hereby **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g).

Plaintiff is cautioned, however, that this opinion does not suggest Plaintiff is entitled to disability benefits. Rather, it speaks only to the process the ALJ must engage in and the findings and analysis the ALJ must make before determining whether Plaintiff is disabled within the meaning of the Social Security Act. *Phillips*, 357 F.3d at 1244.

Upon remand, the Commissioner shall re-evaluate Plaintiff in accordance with the applicable Regulations and prevailing case law. The additional proceedings should include, but are not limited to, reconsideration of Plaintiff's credibility with respect to her subjective

complaints of pain consistent with this Order and Opinion.

## VI. Directions as to Judgment

The Clerk of Court is directed to enter judgment consistent with this Opinion and, thereafter, to close the file. The judgment shall state that if Plaintiff were to ultimately prevail in this case upon remand to the Social Security Administration, any motion for attorney fees under 42 U.S.C. § 406(b) must be filled within fourteen (14) days of the Commissioner's final decision to award benefits. *See* Fed. R. Civ. P. 54(d)(2)(B); M.D. Fla. Loc. R. 4.18(a); *Bergen v. Comm'r of Soc. Security*, 454 F.3d 1273, 1278 (11th Cir. 2006).

**DONE AND ORDERED** at Jacksonville, Florida this 8th day of September, 2009.

*Thomas E. Morris*
**THOMAS E. MORRIS**
United States Magistrate Judge

Copies to all counsel of record